**Michele E. SHEPHERD, et al., Plaintiffs,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants.**

**Civ. A. No. 88–954 (RCL).**

United States District Court, District of Columbia.

Sept. 13, 1994.

506

Mark Lane, Nkechi Taifa, Washington, DC, for plaintiffs.

A. Douglas Melamed, Wilmer, Cutler & Pickering, William H. Jeffress, Jr., Randall J. Turk, J. Bradley Bennett, Miller, Cassidy, Larroca & Lewin, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before this court on plaintiffs' application for attorney's fees and costs under the District of Columbia's Human Rights Act, 2 D.C.C. §§ 1–2501 *et seq.* ("DCHRA"),[1] and defendant's motion for an evidentiary hearing.

On June 13, 1994, this court ordered the parties to submit briefs on attorney's fees, 862 F.Supp. 490. Plaintiffs submitted a petition for $630,764.00 in attorney's fees and costs [2]. In its opposition to plaintiff's brief, defendant American Broadcasting Companies, Inc. ("ABC") demanded further discovery. When plaintiffs partly complied in their reply, this court on August 9, 1994 granted ABC leave to submit a final opposition brief detailing any additional disclosures they sought from plaintiffs. The information sought by ABC's final opposition was provided by plaintiffs' final reply memorandum, finally making this case ripe for decision. ABC subsequently filed a request for an evidentiary hearing on fees, which plaintiffs opposed. Reply and sur-reply memoranda on this request were also filed.

Upon consideration of all the briefs on attorney's fees and costs filed in this case and the entire record herein, this court shall

---

1. Although plaintiffs state that they are seeking their fees under Title VII, 42 U.S.C. § 2000e–5(k) (*see* Pls.' Proposed Order for Relief (May 22, 1992) at 21), the Title VII fee provision is not applicable here because this is not a Title VII action. Plaintiffs brought their suit under the DCHRA, not Title VII. *See, e.g.,* Complaint (filed Jan. 30, 1986 in Superior Court of the District of Columbia) at ¶ 1 ("The plaintiffs allege that they have been subjected to unlawful discrimination and retaliation and to intentional infliction of emotional distress in regard to their employment at ABC, in violation of the *District of Columbia Human Rights Act of 1977* and the common law of the District of Columbia.") (emphasis added);

Mem. Op. of Apr. 15, 1992, 151 F.R.D. 179, 180 ("Plaintiffs ... seek[] injunctive relief and compensatory and punitive damages under the *District of Columbia Human Rights Act,* D.C.Code Ann. Sec. 1–2501, *et seq.* (1981).") (emphasis added); 862 F.Supp. at 490 (plaintiffs brought action under the *District of Columbia Human Rights Act,* D.C.C. §§ 1–2501, *et seq.* (1981)".) (emphasis added). Despite plaintiffs' accidental misnomer of their fee claim, they are entitled to fees under DCHRA.

2. Plaintiffs' final reply seeks $685,252.75 in attorney's fees, plus $7,402.86 in costs.

award plaintiffs $518,711.91 in attorney's fees and costs and shall deny ABC's request for an evidentiary hearing.

## I. FACTS

On April 15, 1992, plaintiffs won a default judgment against ABC and its co-defendants as a sanction against discovery misconduct. Upon reconsideration on September 3, 1993, the court vacated the default judgment against two of ABC's co-defendants [3] but upheld the default judgment against ABC. On June 13, 1994, this court awarded plaintiffs $309,293.33 from ABC in damages based on the default judgment award.[4]

In that same order, the court also determined that plaintiffs were prevailing parties entitled to attorney's fees and costs under the DCHRA, but found that they were not entitled to their claimed 200 percent enhancement for taking this case on contingency.[5] The court deferred the determination of plaintiffs' award of attorney's fees and costs until today.[6]

## II. ATTORNEY'S FEES

The DCHRA entitles plaintiffs' counsel to a reasonable attorney's fee. 2 D.C.C. § 1–2556(b), 1–2553(a)(1)(E). "The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984) (citations omitted). Both the reasonable hourly rate and the reasonable amount of time expended on this case are somewhat less than what plaintiffs have claimed.

### A. Reasonable Hourly Rate

#### 1. Mr. Mark Lane

Mr. Mark Lane, plaintiffs' most senior counsel, seeks $400 per hour for his work in this case. He claims that $400 per hour is his established billing rate and relies on the well-established presumption that a lawyer's established billing rate is the best evidence of a reasonable fee award. *See Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 24–25 (D.C.Cir.1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc,. v. Hodel,* 857 F.2d 1516 (D.C.Cir.1988).

Yet the evidence that he has submitted does not support his claimed $400 per hour billing rate. It is true that some clients paid him $400 per hour, but only after he promised them that their total bill would be no more than a fixed sum. Negotiations in these cases followed the pattern exhibited in this passage from an affidavit of one his clients: [7]

> Mr. Lane said that he generally billed at the rate of $425 per hour. In discussions we attempted to establish a set fee based upon the number of hours Mr. Lane anticipated would be required. He calculated that his fee would be $35,000.

Thus Mr. Lane may begin by telling clients that he charges $400 or more per hour, but he does not ask them to agree to paying him $400 or more per hour for an indefinite work period. Perhaps he could not. His clients might agree to his high "hourly" rate when they know that his fee will not exceed a fixed sum, but might balk at having to pay him $400 per hour or more when the number of hours—and thus the final bill—is uncapped. In any event, whether or not Mr. Lane can command his claimed rate in the marketplace

---

3. Mem. Op. of Sept. 3, 1993, 151 F.R.D. 194, 214–15. Later, plaintiffs' claims against defendants Dyball and Watson were dismissed for plaintiffs' failure to prosecute. 862 F.Supp. at 490–491.

4. The damages claims against defendant Capital Cities was dismissed on June 13, 1994. 862 F.Supp. at 491.

5. 862 F.Supp. at 502.

6. 862 F.Supp. at 503.

7. Decl. of Harland Beach at ¶ 4 (Ex. D to Pls.' Reply).

Declarations of many of Mr. Lane's other clients who he states paid him $400 per hour also follow this pattern. *See* Decl. of Willis A. Carto at ¶ 6; Decl. of Robert Poch at ¶¶ 4, 6, and 8; Decl. of Lorentz Opdahl at ¶¶ 4 and 7; and Decl. of Dr. Ahmad Shamim at ¶¶ 4 and 7 (Ex. D to Pls.' Reply).

for an unlimited number of hours, he has not submitted evidence that he ever has. Moreover, because these fixed-sum billings appear to vary according to the specifics of each case, they are very hard to apply as a guide here. Hourly rates, by contrast, tend to remain uniform, at least among types of cases or types of lawyers, and are thus generally more helpful guides to determining a reasonable rate.

Mr. Lane's other billing evidence is no more persuasive. In response to ABC's discovery request, he has stated that he has almost always charged contingent fees or worked *pro bono* in some civil rights and employment discrimination matters.[8] Obviously, these billings do not establish a billing history of $400 per hour. He states that he has billed $250 per hour for a two-hour task in one such civil rights case,[9] and that he has won a $195–per–hour fee for eleven hours of work as a sanctions award in a DCHRA case,[10] but these are such small and isolated billing instances that they hardly suffice to establish a billing history, and in any event the rates are far lower than his claimed established rate.[11]

Mr. Lane's last piece of evidence is his statement that he is billing one new client $425 per hour in a custody case.[12] The new client entered into the billing agreement on August 15, 1994, and plaintiffs included the agreement in their final reply, filed August 18, 1994. Although plaintiffs cannot be faulted for not including this billing evidence any sooner, the court cannot consider it. Plaintiffs submitted it after ABC had submitted its final request for discovery on August 15, 1994, which has prevented ABC from requesting discovery probing the new evidence. (ABC might reasonably request discovery as to whether the number of hours in the new case is capped, for example.) The court has already extended time for discovery by ordering a second round of fee briefs, and this fee dispute is already on the verge of becoming a second major litigation. Discovery has got to stop sometime. In any event, even if discovery by ABC did not erode this new evidence, no single rate can establish a billing history.

In sum, Mr. Lane has not shown that he has an established billing history of charging clients $400 per hour. He is not entitled to that rate.[13]

■ Where fee applicants' counsel lack an established billing history, they may col-

---

**8.** Ex. D to Pls.' Supp. Reply. Plaintiffs' counsel took *Shepherd* itself on a contingent fee. *See* Agreement to Retain Counsel (signed March 10, 1988) (Ex. F to Pls.' Reply at ¶¶ 2–3).

**9.** Ex. C to Pls.' Supp. Reply.

**10.** *See* Pls.' Supp. Reply at 3 and Exhibit B.

**11.** ABC also argues that Mr. Lane is not entitled to $400 per hour because almost all of his billings for civil rights/employment work are contingent fees or *pro bono*. His $400 per hour work (even if it was done under capped agreements) was all performed in criminal and other cases outside the civil rights/employment area.

Yet ABC provides no evidence to support the suspicion that civil rights/employment work commands different hourly fees from other work. Accordingly, the court declines to rely upon ABC's argument here. *See Brown v. Pro Football, Inc.,* 839 F.Supp. 905, 912 (D.D.C.1993) (RCL) (parties may show that billing histories for one type of work are not "relevant" to the determination of a reasonable fee for another type of work only if they provide evidence that the different legal specialties command different rates).

**12.** *See* Pls.' Supp. Reply at 2 and Exhibit A.

**13.** In the course of his argument for $400 per hour fees, Mr. Lane makes an interesting point that deserves the court's response. He argues that contrary to the court's prior ruling that fee surveys in publications like the *Legal Times* are inadmissible hearsay, *see Brown v. Pro Football,* 846 F.Supp. 108, 115 (D.D.C.1994), Rule 803(17) of the Federal Rules of Evidence exempts fee surveys as "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." Pls.' Application at 7 n. 2.

The touchstone of this exemption is the trustworthiness of the statement. "The basis of trustworthiness is general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate." Advisory Committee's Note, Rule 803(17). The court is not yet convinced that published fee surveys reliably reflect rates actually billed and not rates that surveyed lawyers have artificially inflated for the *Legal Times* audience. However, a future fee applicant may proffer evidence persuading this court that the published fee surveys are legitimate and that they should be used with, or in place of, the traditional fee matrices.

lect fees based upon the "prevailing market rates in the relevant community." *See Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. In *Blum*, the Supreme Court held that lawyers who lack billing histories because they are paid by salaries, not by hourly billings, are entitled to fees based on prevailing market rates. *See Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. Similarly, lawyers whose billing histories are based on fixed sums or on contingent fees may be said to lack billing histories. Accordingly, such counsel are entitled to fees based on prevailing market rates.

The court takes judicial note of the evidence of prevailing market rates in this jurisdiction recorded in the *Laffey* matrix and the U.S. Attorney's Office matrix. Although plaintiffs do not state which matrix ought to determine Mr. Lane's rates, they do state that the U.S. Attorney's Office's matrix should determine the rates of his co-counsel Ms. Nkechi Taifa. (This court agrees with plaintiffs' preferred course. *See infra* at 509–510.) Following that preference, this court will award Mr. Lane the rate charted by the U.S. Attorney's Office's matrix for 1993–94 for lawyers like him with 31 years of experience: $305.00.[14] Mr. Lane and the other lawyers working for plaintiffs are entitled to current rates for their work done long ago to compensate for the six-year delay in payment. *See, e.g., Brown*, 846 F.Supp. at 117 (awarding current rates to compensate for a three-year delay). Accordingly, he shall collect $305.00 per hour for all his time reasonably expended in this case.

2. *Ms. Nkechi Taifa*

■ Ms. Nkechi Taifa, another of plaintiffs' counsel, is entitled to the $215.00 per hour rate she seeks for her work in this case.

Ms. Taifa lacks a billing history for the entire period she worked on this case. She claims that she had an established billing rate of $150 per hour when she was in private practice from 1987–1989, but ABC correctly notes that her evidence does not support this. Her billing evidence shows only that she had asked impecunious clients for $150 per hour and then agreed to take their cases for public-interest reasons when they could not afford her stated rate;[15] that the majority of her cases earned her $35 to $50 per hour under the Criminal Justice Act;[16] that in 1989 a court awarded her $90 per hour for services she completed in her first few years out of law school;[17] and that for her civil rights/employment cases from 1986–1994, she earned either contingent fees, a salary, or nothing at all.[18] There is no evidence that she ever commanded $150 per hour from 1987–89.

She clearly lacks a billing history for the years since 1989 when she began working as a salaried lawyer for the Women's Legal Defense Fund and the American Civil Liberties Union.[19] ABC contends that she has billed clients since 1989, and that she should receive no more than that billing rate.[20] Although she does seem to have billed clients after 1989, she has billed only her old clients whose cases she has continued to handle after she quit full-time private practice. ABC does not dispute that since 1989 she has stopped taking new, billable cases.

■ Because Ms. Taifa lacks a billing history for the course of this litigation, she is entitled to the prevailing market rates for her services. *See Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. She relies upon the U.S. Attorney's Office's fee matrix and several affidavits as evidence of the prevailing mar-

14. *See* U.S. Attorney's Office's Matrix (Appendix A to *Brown v. Pro Football, Inc.*, 846 F.Supp. 108 (D.D.C.1994)).

15. The affidavits of several such clients are contained in Exhibit C to plaintiffs' supplemental reply.

16. Decl. of Nkechi Taifa at ¶ 4 (Ex. D to Pls.' Application).

17. Decl. of Nkechi Taifa at ¶ 23 (Ex. D to Pls.' Application).
The case was *Knop v. Johnson*, 712 F.Supp. 571, 578, 594 (W.D.Mich.1989).

18. Ex. D to Pls.' Supp. Reply.

19. Decl. of Nkechi Taifa at ¶ 6 (Ex. D of Pls.' Application).

20. Def.'s Opp'n at 21.

ket rate.[21] ABC's two arguments against these rates are not persuasive. First, ABC alleges that Ms. Taifa's years as a salaried employee at the Women's Legal Defense Fund and the American Civil Liberties Union do not count as years of experience in the matrix.[22] It may be true that the lawyering experience is different in law firms than it is in public interest offices, but ABC offers no evidence that the matrix contemplates one type of experience and not the other. Second, ABC argues that the rates established by the matrix and affidavits are not the prevailing market rates for Ms. Taifa because the matrix and affidavits record rates for work outside the civil rights or employment area.[23] Yet, as before,[24] ABC fails to support with evidence the suspicion that civil rights or employment work commands different salaries than those charted on the U.S. Attorney's Office's matrix.

Although Ms. Taifa performed some of her work in this case as a lawyer of 8–10 years of experience (who may collect $215 per hour under the current U.S. Attorney's Office's matrix's rate) and some as a lawyer of 4–7 years of experience (who would collect only $175 per hour under the current U.S. Attorney's Office's matrix's rate), she is entitled to the $215 hourly rate of a lawyer of 8–10 years of experience. The court is aware that when the U.S. Attorney's Office settles fee disputes at current rates, it habitually awards "bridging" lawyers like Ms. Taifa the rates that their current number of years of experience earns them.[25]

### 3. Ms. Linda Huber McPheters

Ms. Linda Huber McPheters, who represented plaintiffs in Superior Court of the District of Columbia from December 26, 1985 to on or about August 13, 1987, seeks $135.00 per hour for her work in this case. She claims that $135 per hour was her established billing rate at the time. (She seeks her historical rate because it is the same rate that she charges now.[26])

ABC does not contest her rate nor the reasonableness of the 219.25 hours she worked.[27] Accordingly, she shall be awarded $29,598.75.

### 4. Administrative Tasks

■ In addition to seeking compensation for his performance of legal tasks, Mr. Lane seeks compensation at a lower rate of $80.00 per hour for the 4.75 hours that he spent on administrative tasks like filing, faxing, and copying. ABC concedes that plaintiffs may be compensated for this time, but at no more than $60 per hour.[28] Plaintiffs' $80 per hour figure is based on the $80 per hour fee award granted to a lawyer in another fee case recently before this court for the clerical chores she performed. See Sexcius v. District of Columbia, 839 F.Supp. 919, 925–26 (D.D.C. 1993) (RCL). Because ABC does not state in its opposition why $60 per hour is more

---

21. She declines to rely on the *Laffey* matrix, even though as extrapolated by adding $10 per year since 1988–89, it would award her more than the U.S. Attorney's Office's matrix would. She states that she was cautioned by this court's observation that the *Laffey* matrix will soon have to be extrapolated with hard evidence and not guesswork if it is to remain reliable. See Decl. of Nkechi Taifa at ¶ 28 (Ex. D to Pls.' Application).

22. Def.'s Opp'n at 23.

23. Def.'s Opp'n at 22.

24. *See supra* note 10.

25. This court's decision in *Brown v. Pro Football*, 846 F.Supp. at 117 nn. 16, 17 and Appendix B, is not to the contrary. In that case, this court awarded different rates to single lawyer for work in his capacity as a law clerk and later as a recent law graduate. That change *in kind*, from a law clerk to a practicing lawyer, merited the change in rate. Here, by contrast, Ms. Taifa has merely undergone a change *in degree* as she has gathered more experience as a lawyer.

26. Pls.' Application at 9.

27. In its statement of uncontested fees and costs at page 4 of its opposition brief, ABC listed Ms. McPheters' hours as "218.25" instead of "219.25." Because the difference is so small and because ABC has offered no reason why it might contest a single hour, the court will assume that this is a typographical error and that ABC does not oppose any of Ms. McPheters' claimed 219.25 hours.

28. *See* Def.'s Opp'n at 4. Somewhat contradictorily, ABC later argues that a lawyer like Mr. Lane should not be compensated for such tasks. *See* Def.'s Opp'n at 10. The court will hold ABC to its first statement.

appropriate, the court will award plaintiffs their requested $80 per hour for Mr. Lane's time on administrative tasks.

## B. Reasonable Number of Hours

█ In general, plaintiffs' counsel appear to have used good billing judgment. For example, they have declined to bill ABC for their travel time [29] or for at least 500 hours of their paralegal time.[30]

However, several problems with plaintiffs' counsel's time records make this court suspect that his bill is somewhat inflated, and accordingly the court will award counsel compensation for only ninety percent of his claimed time. To save scarce judicial resources, district courts may shave a percentage of counsel's hours instead of "decid[ing], for example, whether a particular motion could have been done in 9.6 hours instead of 14.3 hours." [31] A ten percent cut is clearly within this court's power.[32]

Plaintiffs' counsel's time is not documented as well as the court has a right to expect. The billing statement that plaintiffs produced in their initial fee application on May 22, 1992 describes counsel's services much more sparsely than their more recent fee application.[33] Details later added to plaintiffs' coun-sel's time records make this court suspect that sufficiently detailed time records were not kept here in the first place. Attorneys who anticipate shifting their fees lack a direct incentive to keep their hours reasonably low, so courts must insist that such attorneys keep very detailed time records to prove that their time was well-spent.

Further, plaintiffs' counsel have submitted conflicting and contradictory fee requests. One of the sharpest such disputes between plaintiffs' counsel is the battle between Mr. Lane and Ms. McPheters over credit for the drafting of the complaint. Mr. Lane claims that he spent 64.75 hours preparing the complaint.[34] In a sworn declaration accompanying his statement of hours, he states that he "participated" in drafting the complaint.[35] In another sworn declaration filed shortly afterwards, he states that "during the short period of time that Ms. McPheters was associated with the case ... Ms. McPheters typed the pleadings and often I dictated them at my offices." [36] Ms. McPheters claims that she alone prepared the complaint, and that she spent only 18.00 hours doing it.[37] She states in her August 16, 1994 reply to plaintiffs' fee submissions that she drafted the complaint, shared her completed draft with

---

29. Plaintiffs have not sought to shift to ABC most of the time their counsel spent travelling to depositions, to the offices of defendant's law firm, to each counsel's office and home for meetings, or to the office of Mr. Joseph Yablonski, a fee applicant who has appeared before this court. Decl. of Mark Lane at ¶ 61 (Ex. C to Pls.' Application).

30. Decl. of Mark Lane at ¶ 22 (Ex. C to Pls.' Application); Pls.' Supp. Reply at 7.

31. *Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir.1980) (*en banc*).

32. *See, e.g., In re North (Gadd Fee Application),* 12 F.3d 252, 257 (D.C.Cir.1994) (reducing fees by thirty percent where inadequately detailed supporting documentation); *Kennecott Corp. v. E.P.A.,* 804 F.2d 763, 767 (D.C.Cir.1986) (reducing fees by fifteen percent for time records that were "generalized summaries of work performed ... reconstructed from the contemporaneous time records that have been withheld.").

33. In Exhibit C to its opposition, ABC has catalogued every one of plaintiffs' counsel's later additions to the time record.

34. Lane's hours are recorded in his "Statement of Professional Services Rendered" (Ex. A to Pls.' Application).

Although his statement of hours is unsworn, Mr. Lane affirms its accuracy in his sworn declaration filed the same date (Ex. C to Pls.' Application). In that sworn declaration, he states that "[t]hat statement is based upon the hours expended on behalf of my clients in this case" (¶ 16), that "[t]he hours which I devoted to this case comprised only that time which I was constrained to devote to the case in the interests of my client" (¶ 17), and that he "continually used sound billing judgment in an effort to minimize the time spent" (¶ 17).

35. Ex. C to Pls.' Application at ¶ 11. Specifically, he states that he "reviewed documents submitted by the plaintiffs, researched the prevailing law and then participated in drafting the complaint" (¶ 11).

36. Decl. of Mark Lane, Ex. A to Pls.' Reply, at ¶ 14.

37. Her statement of hours is attached as Exhibit A to her sworn affidavit on fees filed May 21, 1992.

Mr. Lane and the plaintiffs for their review, made the minimal changes recommended, and filed the complaint almost exactly as she drafted it. She denies that Mr. Lane ever dictated the complaint to her for typing.[38] The fact that two of plaintiffs' lawyers do not trust each others' time records makes the court hesitate to trust any of the records.

■ Lastly, ABC objects that plaintiffs' bill for more than $47,000.00 for preparing the reply on the fees issue is unreasonably large, larger than the fees Mr. Lane has collected in many other cases. (Def.'s Supp. Opp'n at 9.) Yet fee applicants are entitled to reasonable attorney's fees expended pursuing a fee award,[39] and plaintiffs here are entitled to reasonable attorney's fees their lawyers expended not only in preparing the reply on the fee issue, but in preparing the fee application and the supplemental reply. The amount a fee applicant has collected from other clients in the past on unrelated matters is no cap on the amount he can collect for his reasonable efforts in fee litigation. Because this blunderbuss attack of ABC's adds little to the more specific critiques above, the court will not view plaintiffs' fee-for-fees bill any more critically than the rest of plaintiffs' billing. However, ABC's more specific critiques above persuade this court to reduce plaintiffs' counsel's hours—expended both on the merits of this case and on the fee litigation—by ten percent.[40]

### III. COSTS

■ ABC does not object to an award of $2,910.03 of plaintiffs' claimed costs in this litigation.[41] Plaintiffs have dropped all outstanding contested costs[42] except for one pair of related expenses: the $3,825.00 paid to Dr. Hamlin for his opinion on plaintiff Shepherd's post-traumatic stress disorder, and the costs related to Dr. Hamlin's deposition ($595.60 for a transcript and $72.23 for PIP Printing).[43] Hours devoted to unsuccessful issues should not be compensated,[44] and ABC argues by analogy that plaintiffs' costs expended in pursuing this losing claim should also be disallowed.[45] Here, ABC argues that the court's finding that Ms. Shepherd's post-traumatic stress disorder claim failed as a matter of law[46] renders the costs non-compensable. Yet because Dr. Hamlin's deposition testimony formed part of the basis for Shepherd's other, successful claim of intentional infliction of emotional distress,[47] these costs were not expended wastefully and ABC's argument fails. Accordingly, plaintiffs shall be awarded $7,402.86 in costs.

### IV. MOTION FOR AN EVIDENTIARY HEARING

■ On August 23, 1994, ABC filed a motion for an evidentiary hearing to resolve the heated dispute between Mr. Lane and Ms. McPheters over credit for time spent on tasks in this case. The motion was prompted by what ABC calls the "startling assertions" of Ms. McPheters' August 16, 1994 reply, presumably her statements that she, not Mr. Lane, is solely responsible for such tasks as drafting the complaint in this case.[48] However, ABC knew about the fight between Mr. Lane and Ms. McPheters over credit for drafting the complaint and other tasks long before Ms. McPheters filed her August 16, 1994 reply, and partly relied upon it in its opposition to the fee award.[49] ABC knew

38. Huber's Reply to Pls.' Application at ¶¶ 2–3.

39. *See, e.g., Copeland,* 641 F.2d at 896 ("time spent litigating the fee request is itself compensable").

40. Because ABC has conceded the reasonableness of all of Ms. McPheters' time, this ten percent cut shall not affect her time.

41. Def.'s Supp. Opp'n at 2.

42. Pls.' Supp. Reply at 5.

43. Def.'s Supp. Opp'n at 3.

44. *See Brown,* 846 F.Supp. at 118.

45. Def.'s Opp'n at 30.

46. 862 F.Supp. at 492–494.

47. 862 F.Supp. at 495.

48. Def.'s Motion for Evidentiary Hrg. at 1.

49. *See* Def.'s Opp'n at 8 (filed July 22, 1994).

about the substance of Ms. McPheters' objections from a letter she wrote to plaintiffs on November 12, 1987, which stated that "I have been solely responsible for all aspects of your representation from the outset to the present time, including: initial interviews and investigation, preparation of the complaint filed in the Superior Court" and other tasks.[50] ABC also had Mr. Lane's response to Ms. McPheters' claims, stating that "Ms. McPheters' past efforts included seeking credit for the work in this case, withdrawing from the case against the wishes of her clients and co-counsel, refusing to return those files in her possession to their clients until a complaint was filed against her with the Bar Association, the filing of a lien by her against her clients in this case and other conduct of a surprising nature." [51]

ABC stated in its opposition that its proposed solution to the dispute was simply to cut the number of Mr. Lane's hours by some fraction and to award Ms. McPheters compensation for all of her claimed hours.[52] Although Ms. McPheters' recent filing may add some new cumulative information to this dispute, it adds nothing startling and nothing demanding a fresh inquiry into the facts. This fee litigation must not be derailed by the conflicting affidavits of a pair of disgruntled former colleagues who have had a bitter parting of the ways. Ruling otherwise would permit satellite litigation galore and would transform this already lengthy fee dispute into a second major litigation. Accordingly, the court shall take ABC's original suggestion to reduce the number of hours and shall deny ABC's recent motion for an evidentiary hearing.

## V. CONCLUSION

The court extends its commendation to Mr. Lane and Ms. Taifa for obtaining exceptional results for their clients in this case against a powerful opponent. Counsel contributed to the development of the law of sanctions in this Circuit and served the court in the highest tradition of the bar. A separate order shall issue this date awarding plaintiffs $518,711.91 in attorney's fees and costs in accordance with this opinion.

## ORDER

This case comes before this court on plaintiffs' application for attorney's fees and costs under the District of Columbia's Human Rights Act, 2 D.C.C. §§ 1–2501 et seq., and defendant American Broadcasting Companies, Inc.'s ("ABC") motion for an evidentiary hearing. For the reasons stated in a memorandum opinion issued this date, it is hereby ORDERED that

1. Defendant's motion for an evidentiary hearing is DENIED.

2. Plaintiffs are awarded $518,711.91 in attorney's fees and costs, in accordance with the chart below:

| Name | Hours | Hourly Rate | Total |
|------|-------|-------------|-------|
| Mark Lane | 1,137.65 [1] | $305.00 | $346,983.25 |
| Nkechi Taifa | 624.87 [2] | $215.00 | $134,347.05 |
| Linda Huber McPheters | 219.25 | $135.00 | $ 29,598.75 |
| Administrative Tasks | 4.75 | $ 80.00 | $    380.00 |
| Total Fees | | | $511,309.05 |
| Total Costs | | | $   7,402.86 |
| Total Fees and Costs | | | $518,711.91 |

50. See Def.'s Opp'n at 8 n. 5 (quoting the letter).

51. Ex. C to Pls.' Application at ¶ 41.

52. See Def.'s Opp'n at 7–9.

1. Mark Lane claims a total of 1,264.05 hours. He is entitled to compensation for 90 percent of that time.

2. Nkechi Taifa claims a total of 694.30 hours. See Ex. B to Pls.' Application. She is entitled to compensation for 90 percent of that time.

3. Defendant ABC shall pay plaintiffs the attorney's fees and costs as set forth herein.

SO ORDERED.